Good morning, Your Honor. For the record, Attorney Rafael Castellan, appearing on behalf of Appellant McDoy Berrios-Bonilla. Your Honor, I would like to concentrate on the issue of sufficiency of evidence arguments that were raised in the brief. This court has repeatedly recognized that a conviction may not be sustained when one has to pile inference upon inference in order to meet the reasonable doubt standard of proof. Yet that is precisely what the government in its argument ignores. The government, in its brief, plays a blind eye to the fact that the night of that incident, Berrios-Bonilla did not drive nor did he have control of the pickup truck, and did not even sit in the passenger seat where the firearm was found beneath that, nor in the right rear side of the pickup truck where the firearm was found after the police shone a spotlight on it. Wait, I thought that there was testimony that he started to come out of the open door on the back seat on the passenger side. Yes. By the way, no, he didn't start. Sergeant Nieves, whom the government informed after the trial, was indicted by the government for being part of a corrupt police organization that repeatedly lied and fabricated evidence. That witness said, which is unbelievable, that he saw him stick his head out of the right side of the rear passenger seat. The evidence that is totally clear is that he was sitting on the left-hand side of the rear passenger seat. Now this lone liar, it seems incredible, that if he was sitting on the left-hand side and had possession of the firearm, what he would have done is stick it underneath the driver's seat and run out of the left-hand side. Why would he, if he's sitting on the left-hand side of the rear, go all the way to the right and stick his head out and then go back and run out of the left-hand side? Well, there was evidence to that effect. Somebody testified to that, didn't they? Yes, yes. And the jury believed it. You say it's unbelievable, but the jury believed it. But that's not the issue that decides this. No, of course not. There's a few other things I wanted to mention. Will you give me a minute? There are eight persons, eight persons that were in that vehicle prior to that firearm being found out. But there's testimony, excuse me, I'm going to have to interrupt you. There is testimony that he was the last person seen in the vicinity of where the gun was found. You don't believe it? That's fine. The jury believed it. There's also testimony that his license, your client's license, was found in the vicinity of the machine gun. It was in a pocket. Well, that's the vicinity. It's his vehicle. Yeah, that's the vicinity. It's his vehicle. There's also testimony that Alamo, when she was dancing with him, felt a hard object on his waistband in his back. Yes. Is that right? She felt something hard. She felt something hard. She stated clearly that she never saw him in possession of a firearm. She never described the hard object as a firearm. And, in fact, if the court looks at the photo of that firearm. Hey, can I continue please? You're going to have to wait until I finish. Yes, Your Honor. There's also testimony that your client fled from the scene. Sure, he was on probation. Well, he must have had some feeling that he had done something wrong to cause him to run. With all due respect, Well, that is tremendous. He had assaulted someone at the motel. There could be evidence. There could be. These are all things that you say are supposition upon supposition. I think it's more than that. And there is evidence that your client called Alamo to tell her, to testify that she didn't know who he was. All these things add together. Why aren't they sufficient to go to the jury? I'll go one by one. Okay. Because there's nothing. You can't really go one by one. You can't. Of course. But eventually you have to put it all together. Of course, of course. I'll go to the crucial one. There's absolutely nothing in the record that would justify a finding that that firearm could not have been placed there by any of the other eight individuals that were in that vehicle prior to the defendant being in the left-hand side of the vehicle. That is an argument you could make. But the government doesn't have to discount every possibility. They have to present enough to create a reasonable doubt to go to the jury. And tell me why all these things put together that I have mentioned are sufficient evidence to create a reasonable doubt to go to the jury. Well, I submit to the court that in order to exclude the other eight people, you have to pile inference upon inference. Well, you add to that that Veronica stated clearly that she had never seen him that night with a firearm, that he had done nothing illegal that night, Your Honor. Again, again. And you see the photo of that large firearm. And she says I was with him that whole night and I never saw a firearm. Your Honor, there are two theories. And that's what the court, and I'm not saying that the government did not present a theory. I'm saying that with this evidence, there were two theories that were equally or nearly equally applicable. One to sustain guilt and one of innocence. Excuse me, counsel. It seems to me you're leaving out one piece of her testimony, though, and that is that she says there was no gun under the seat when she was sitting there. No, no. She did not say that. She did not see the firearm until the police shined a light on the back seat. And when they shone the light, that's when she saw a firearm. She was in the back seat nagging out with the defendant. There's no evidence that she was observing what was under the front seat. Where her seat were. That's not what she testified. She saw it for the first time when the spotlight was shown after they were all arrested by the police. Where was the license found? The identification card? The license? It was on a side pocket of his vehicle where nothing illegal was found. What do you mean a side pocket of his vehicle? You have the back seat, you have a door, and there's a pocket on the side. In fact, there's a photo of it in the appendix of page 379. It's the back seat, right? Excuse me? It was found in the back seat, not the front seat. That's correct. It's his vehicle. That's all I was asking. He had been sitting in the back seat. Sure, it's in the back seat. His gun was found on the same side of the back seat as the license. No, not in the same place. Well, not in the same place. Not in the same place. They were in the same pocket. Not in the same place. One was in the floor and the other one was on the side. On the side, yes. Okay. The uncontroverted evidence is that eight people were there before he came in, and there's nothing to exclude any of them having placed it. There's two theories. Eight people sat in that seat? Excuse me? Eight people sat in that seat? Yes. Eight people sat in that seat? When Carlos Fernandez went to pick up Maria and Veronica, he was with five males. This is like the Volkswagen that people keep coming out. Well, no. It's that there were different events. There were five people initially. Then when they partied, two unidentified males were driving and one in the passenger seat. Any of those people could have placed that. Why is it reasonable for a jury to exclude that theory of defense? Counsel, can I just ask you, there is this charge, and there was a lot of evidence on it about his attempt to persuade A.A. to provide false statements to federal law enforcement officers. Yes. I'm alluding to that right now. Right. And I know you have independent arguments about that, but all of the efforts that he made to influence the testimony of this critical witness couldn't the jury factor that into this sort of mosaic of evidence that Judge Trelao and Judge Howard have referred to? It's all part of the same picture. I mean, he's very concerned that she is going to testify in a way that's going to be harmful to him, and so he makes all of these efforts. I mean, that's sort of the guilty mind situation. With all due respect, what the conversations reflect is that the people that called her on his behalf didn't ask her to lie. She was asked to talk to a lawyer. That's what he asked her to do. Now, let's go into that specific part as to the aiding and abetting. I submit to the court that the government speech totally failed to address the standard. They only looked at that one single statement of hers that he said, don't identify me and say everything was randitos. And, in fact, their whole brief, Your Honor, their whole brief, one sentence, is addressed to that. Finally, the government presented evidence of lying but misconduct that night in question, instructing Adam to tell a story. She didn't know who he was and say everything is randitos. That's not the test, Your Honor. You just rendered an opinion, opinion santo, Your Honor, stating that we evaluate the sum of all the evidence and inferences derived herefrom and determine whether the sum is enough. Well, that's why I've been urging you to do it. You don't want to do it. Well, I am. I am trying to do it. No, the sum of all this leads me to believe that there was something more than just naked going on in the back of that trunk. This guy was telling her not to identify him because he was afraid they would connect him with a gun. Well, Your Honor, with all due respect, if anything, what Veronica told him was that she had not seen him do anything illegal that night. She stated clearly. In fact, she was a defense witness. It's totally illogical. For Maria Bonilla to have asked her not to identify him when in fact she had not seen him do anything illegal. She had not seen him in possession of a firearm. The incident at the motel had to do with Torres Fernandez. So there's no reason for him to ask for the lie. And when we take the sum of all the evidence, it is simply incredible, Your Honor, that we ignore the fact that Maria was in that car. Maria knew who Berrios Bonilla was. Now, the government didn't have Maria testify. You want, in the consideration of the sum of all the evidence, you want to ignore the fact and state that it is true that he asked her not to identify him, but he forgot to go to Maria, who knew who he was, and didn't ask her to say, you don't know me. Your Honor, look at the sum. That is simply ridiculous that Bonilla would have said that and not gone to Maria. And the fact that the government did not have Maria testify, I think, is a significant fact that has to be factored into this tampering, witness tampering, assignment of error. This is a witness where the defendant had no reason to ask her to not identify him. In fact, he said, I'm going to turn myself in. So if he's turning himself in, he's not hiding his identity. And it seems totally illogical, again, in the sum of all of the evidence, that if this lady had not seen him do anything wrong, if this lady didn't see him go to the forum, and in fact, she was going to provide testimony that was favorable to him, that he would go and ask her to lie. It doesn't add up. And the lack of the testimony of Maria really, really, I believe, takes away from the sufficiency argument that this court, that that evidence was sufficient for a jury to find that he told her, don't identify me. Counsel, could you clarify for me, there was a, she does this critical interview with one of the investigating officers. It is recorded, is that correct? There's an audio recording of that interview? Yes, I tried to present my evidence. I was not allowed. And does that audio recording include her statement that he asked her to not identify him? That's another factor. It did not. That was an extensive interview, which is why it was necessary to present the whole interview. Because she never mentioned to the agents on September 2nd, 2014, that he asked her to do anything incorrect. Where does that come from, the evidence that she attributes that statement to him? Where does that come from? After, after she had two conversations with the defendant, and afterwards, in another interview with the agents after September 2nd, since they didn't record, that's when she allegedly, for the first time, makes these statements. So that arguably critical admission by him that he's got a guilty state of mind, that's not subject to a recording at all. That's just one of the investigating officers saying that she said this. That's correct. That was not recorded. Okay. Is it your assertion that it's unbelievable that he would have ever said anything like that to her? It's unbelievable because he knew that Maria was there also. How can you go to one and not to have gone to the other? And the fact that they did not have Maria testify on it, that is crucial. Which we submit that with the other assignments of error concerning the instructions, clearly, when Duane Berrios was deprived of a fair trial, his theory of defense was not reflected in the jury instructions. There was definitely a basis for a weaker but less satisfactory evidence instruction. Definitely he should have received an instruction that merely because he was the owner of the car, that in and of itself did not warrant him finding a constructive or actual possession. Very good. Thank you. Thank you. Good morning. May it please the court, AUSA Nicholas Cannon on behalf of the United States. In this case, the government presented more than sufficient evidence for a jury to find defendant Berrios guilty of counts four, five, and six, the two federal weapons offenses, as well as the obstruction. The trial testimony from Sergeant Angel Hernandez established that in the early morning of the trial, August 17, 2014, him and fellow officers received a call for a lookout of a black pickup truck Ford. Shortly thereafter, they see the vehicle and actually get behind it to call more units. As they are behind the vehicle, it stops on its own accord, and the officers see a female exit the right rear passenger seat. That female occupant would later turn out to be government witness Veronica Alamo. Officer Hernandez begins to approach the vehicle, and as he does, he sees the appellant, Mr. Berrios, peek his head out of that same door, the right rear passenger door. The officer sees Berrios and orders him to stop, identifies himself as a police officer, wherein Mr. Berrios immediately runs out of the opposite side of the vehicle. Meanwhile, his partner, Officer Rodriguez, approaches the driver and detains him over in the area that Ms. Alamo had exited the vehicle. At that time, he shines his flashlight on the floor of the F-150 on the right rear passenger floor and sees the firearm. And that's kind of the critical point for the government's evidence, that shining of the flashlight. Because Ms. Alamo testified, and I want to alert the court to this eight-person theory, which was obviously heard by the jury and rejected. Ms. Alamo testified that her and the other three occupants in the car were essentially bar hopping that night. They went to several bars, they went to a motel, and it was four of them in the vehicle. And she was in the back seat, and at no time in the back seat from any of those bars while she was exiting and entering did she see a firearm on the floor. She testifies that the reason they pull over is because she spills on herself. She actually spills food on herself while seated in the right rear passenger seat and never sees a firearm. She doesn't see it until the officer shines a flashlight on it right where Mr. Berrios had been seen by the officer. And we argued to the jury that that was the point that Mr. Berrios got rid of his firearm and ran. And as Your Honor noted, she does testify she felt a hard object on the backside of Mr. Berrios, which common sense a jury could infer was consistent with that firearm. When you look at the totality of all of those circumstances, particularly the timeline of Ms. Alamo's testimony of what was going on in that back seat, you consider the driver's license, you consider the defendant's flight, and as Your Honor noted, you consider his conduct afterwards. What was the jury given in terms of an explanation for the driver's license being found there? Not by the government, but by the other side. I don't recall. If I recall correctly, the other side argued that it was his vehicle. And so, you know, he would have belongings in there as kind of a natural occurrence to the ownership of the car that was stipulated to by the parties that Mr. Berrios actually owned the pickup truck that they were driving in that night. The government... But was there any specific explanation for why he would keep his driver's license in the right rear door? I don't recall if there was any explanation from either side about why that particular driver's license would be in the car that night in the side pocket. It is an odd place for someone to have a driver's license, but because they were going to separate... Well, I should hope the government had an explanation since you consider it part of the circumstantial evidence. Well, it's circumstantial evidence that he was seated in the back seat for a long period of time. Yes, that's all I meant. Yes, Your Honor. And that's... We... In our closing, though, we... It's a small piece of what...of evidence to indicate that he was back there. When the government is preparing for trial, we cannot be sure kind of what the defense is going to be. Maybe in this particular case, because the defendant is not arrested that night, he actually makes good his escape. He's not taken into custody. The only individual besides Ms. Alamo who could identify him as being in the rear of that car was the sergeant. So that, when preparing for trial and getting ready, that evidence is critical to the identification of the defendant. And it turns out, at trial, that wasn't an issue raised by the defense, that this wasn't actually him in the back seat. And so that's why it was a critical piece of evidence to introduce during the government's case in chief, certainly because we're not aware what the defense may or may not be. And defenses can change during the course of a trial. So when Your Honor considers... When Your Honors consider all the totality of the circumstances, and I was... The post-arrest statements... Now, before you get there, how large is this firearm? It was a standard Glock firearm, Your Honor, a police-issue-style firearm. And it was... There's a lot of testimony about it being under the front seat. The picture that was taken and shown to the jury, which is Government's Exhibit 5, was taken before any law enforcement or anybody moved it. Officer Rodriguez testified that as soon as he saw the firearm, he called technical services. And they came and they took photographs of how the firearm looked right when he saw it. And it's not under the seat. It's halfway protruding under the seat and halfway on the floor. You could see it from the visible eye standing outside of the vehicle. And that's a critical factor, I think, when the jury was shown that photograph, to determine whether or not a reasonable person in that back seat would have noticed the firearm. Had it been completely under the seat, I think the argument proposed by counsel that Ms. Alamo wasn't in a position to know whether or not someone else put it in the back seat that night would have more weight. And it just doesn't because it's literally right on the floor. Was there testimony or other evidence about how difficult it would have been to have put the firearm there from the front seat, someone sitting in the front seat? There wasn't testimony directly to that, Your Honor's point. However, the government did put on a witness that testified that there was another firearm found in the front seat. The government did that because during the course of the trial, the defendant, the appellant made several references to the driver as potentially being the owner of the firearm. And the government put on the fact that a firearm was found right under the driver's seat, where Rolando had been seating, to make the argument. And I think the jury can infer from that that there's two individuals in the car that were, or there's two men in the car, they're seated behind each other, and there's two firearms, that the firearm belonging to Rolando was the one under the driver's seat where he was seated. The one in the back seat was Mr. Barrios's, where he was last seen by Officer Hernandez. Were any of these two firearms that were found under the seats, the one further front and the one further back, they were fingerprinted? They were not, Your Honor. Is there a reason for that? I think it would be speculation. There's nothing in the record to indicate why they weren't fingerprinted. From my personal experience, the resources of different law enforcement agencies determine, I think, what gets fingerprinted and what doesn't. Oftentimes, there's the fingerprints, or the attempt to get fingerprints doesn't bear fruit. And so I believe that they have different categories of crimes that they're going to use the resources to attempt fingerprints, but none were done in this case, Your Honor. Counsel, this recorded statement in this item of the defendant's counsel talks about a fair bit. Did the government make any attempt to use that statement? Or was it entirely defense counsel who wanted to use it to try to establish some inconsistencies between what she said in that interview and her trial testimony? Was the government trying to use that for its own purposes? The government never attempted to use any portion of the recorded statement of Ms. Alamo. Okay. And the reason was? Well, we believe it's hearsay, first of all. It's just a prior statement of hers to another witness. The government did have the entirety of the recording transcribed and interpreted into English for the purposes of potentially impeaching her as our own witness if she was to testify inconsistently, and to provide for the defense, obviously, in their use of the impeachment of her because the recording is completely, almost completely, there is a couple English sentences at the beginning. I don't want to mislead the court. But it is almost completely in Spanish. Did the defense have a copy of the transcript? Yes, Your Honor. The government provided a copy of that transcript, and there was no objection to the translation or to the transcript at any time during the course of the trial. So the defendant sort of alludes to this notion that, as a matter of fairness, the complete statement should have been available for use, but that's not, that argument might work if the government had been trying to use some portion of it, but it was only defense counsel that was trying to use that audio statement. Is that correct? That is correct, Your Honor. So that notion of complete, that sort of doctrine of completeness really doesn't work if it's the defendant trying to make the argument. That's correct, Your Honor. I think the utility for the defendant, in this case, with the statement, was that she does not mention to Agent Fajardo in her original September 2 interview what formed the basis for the obstruction count. She does not mention that to him. The government, and this is in the record at sidebar, warned that if she was asked why, she didn't mention that, and certainly the defense could impeach her with that. If she was asked why, she didn't mention that. She would say that she was scared, and we put that on the record. Nonetheless, the defense counsel was able to make pretty good use of the transcript in impeaching her with that fact that she had never said it, and that what she had said to Agent Fajardo, or Task Force Officer Fajardo, on September 2 was that the defendant was essentially not guilty. He didn't do anything wrong. All of that ended up coming in during the cross-examination of Ms. Alamo anyway, which is what the government actually sought to keep out. So in terms of the use of the statement in any prejudice, I don't believe that this Court can look at the entirety of the record and find that there was any prejudice in the use of the transcript. And with regards to the argument that counsel makes in his brief, and he made it at the district court level regarding the tone of voice, that context, that tone of voice analysis is typically not, and I couldn't find a case that said exactly what I am going to propose to the Court, but the tone of voice analysis is typically with regards to live testimony of a witness when the jury is judging credibility. The importance of that is not the same as when you're in an impeachment context, which is actually the existence of the prior statement, or the existence of the lack of saying something on a prior occasion. By way of example is grand jury testimony. Grand jury testimony is typically given out to the defense prior to a witness's testimony. As Jank's evidence is used repeatedly as impeachment, and it comes in as substantive evidence, and here in this district oftentimes witnesses will testify in the grand jury in Spanish. It will be then translated into English, and then the English translation is their Jank's, their prior statement. And so I don't think we can get very far by considering that argument, that it was necessary for the jury to hear Ms. Alamo's tone of voice on her prior statement. I don't think it's very instructive or helpful. It would require that every prior statement that was recorded somehow in Spanish be played before the jury, and I don't think there's any precedent for that. And finally, just with regards to the jury instructions requested by the defendant, there's two instructions. The government's argument is basically the same on both, and that is that they were substantially covered by the court's instructions. The court advised repeatedly that the defendant had no burden to put on evidence, and that the lack of evidence could suffice to acquit him. And most importantly, which is the third prong of the analysis when considering proposed instructions, is that there was no prejudice. The defense counsel was able to argue all of his points that both of the instructions would have told the jury elaborately during his summation. And so we think for those reasons, both instructions, the court should find that both, that the court's instructions certainly satisfied, certainly portrayed the law correctly, and that there's no prejudice to the defendant for not giving his exact wording for those two instructions. If there's nothing further, Your Honors, thank you. Thank you. We'll take a brief recess. Recess. Okay. Thank you.